# UNITED STATES DISTRICT COURT

NOV - 4 2004

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

RAMON BERRIOS,
JOSE TORRES,
WALTER DE JESUS, and
JAVIER REYES

**UNDER SEAL**

**CRIMINAL COMPLAINT**

CASE NUMBER: **04CR 970**

**DOCKETED**
NOV 0 9 2004

**MAGISTRATE JUDGE SIDNEY I. SCHENKIER**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about August 23, 2004, in DuPage County, in the Northern District of Illinois, Eastern Division and elsewhere, defendant did, by intimidation, take from the person and presence of tellers at WECO Credit Union, 1700 Hawthorne Lane, West Chicago, Illinois, approximately $107,803.36 in United States Currency belonging to and in the care, custody, control, management, and possession of the WECO Credit Union, the accounts of which were then insured by the National Credit Union Administration Board, in violation of Title 18 United States Code, Section(s) 2113 (a) and 2. I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: X Yes ___ No

Eric R. Kaley, Special Agent, FBI
**Signature of Complainant**

Sworn to before me and subscribed in my presence,

November 4, 2004                      at            Chicago, Illinois
**Date**                                              **City and State**

SINDEY I. SCHENKIER, U.S. Magistrate Judge
**Name & Title of Judicial Officer**                  **Signature of Judicial Officer**

I, Eric R. Kaley, being duly sworn under oath, state as follows:

1. I am a Special Agent with the Chicago Federal Bureau of Investigation (FBI), and have been so employed for two and one half years. I am assigned to the FBI's West Resident Agency (WRA). My duties at the WRA include the investigation of various crimes, to include the investigation of bank robberies, fugitive matters, kidnapings and other violent crimes.

2. I make this affidavit from personal knowledge based upon my participation in this investigation, reports I have read and conversations I have had with others who have personal knowledge of the events and circumstances described herein. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

3. On August 23, 2004, at approximately 7:00 a.m., the WECO Credit Union ("WECO"), located at 1700 Hawthorne Lane, West Chicago, Illinois, was robbed. At the time of the robbery, the accounts of WECO were federally insured by the National Credit Union Administration Board. At the time of the robbery, there was one employee working ("the employee") and the employee was also the president and C.E.O. of WECO, and is responsible for hiring. According to the employee, the robbers were two unknown Hispanic-looking males. The employee told law enforcement agents that he was confronted at gunpoint by the first unknown Hispanic-looking male (Person 1) and was forced to the ground. At this point, the second unknown Hispanic-looking male (Person 2) entered WECO. Person 2 wore a ski mask when he entered WECO, but during the robbery, Person 2 removed his ski mask. While Person 1 held a gun to the

1

victim employee, Person 2 went directly to one of the safes at WECO, where he removed money from the safe using a key that he had just obtained from within WECO. The employee told law enforcement officials that he noticed that Person 2 knew where in WECO the key to the safe was kept. Person 2 then ordered the employee to open another safe at WECO, from which Person 2 then took additional money. Prior to departing, Person 1 and Person 2 took the victim employee's driver's license and warned the employee not to "do anything stupid" because they (Person 1 and Person 2) now knew where the employee lived. Person 1 and 2 then departed WECO. The employee told law enforcement officials that prior to the robbery, the only car he had seen in the parking lot at WECO was a red car. The employee looked in the parking lot immediately following the robbery and saw that the red car was gone. According to the employee, the total loss amount to WECO was approximately $107,803.36.

4. On October 25, 2004, a confidential source familiar with the WECO robbery was interviewed by law enforcement officials. The confidential source (CS-1) told law enforcement officials that four individuals were involved in the WECO robbery. CS-1 said that CS-1 is an acquaintance of Person 2 and was told about the robbery by Person 2. CS-1 identified Person 2 as RAMON BERRIOS. According to CS-1, BERRIOS relayed details of the robbery to CS-1, including the details about the appearance of the employee, and that the employee's identification was taken and how the employee was threatened. According to CS-1, BERRIOS told CS-1 that BERRIOS learned about WECO through a former employee ("Person 3"), with whom CS-1 was not familiar. BERRIOS told CS-1 that he committed the robbery with two accomplices, "Walter" and "Joey." CS-1 told law enforcement officials that CS-1 knows "Walter" and "Joey," who

2

are both Hispanic-looking males, but only knows their first names. According to CS-1, BERRIOS told CS-1 that a female associate ("CS-2"), who CS-1 knows, had been paid $700 for letting BERRIOS use her car in the robbery. According to CS-1, CS-2 drives a red car. BERRIOS also told CS-1 that Person 3 had been questioned by the FBI, and that BERRIOS, Person 1 and Person 3 had then decided to stash in a safe the money that remained from the robbery. According to CS-1, BERRIOS told CS-1 that the money was stashed in a safe at "Joey's" residence.

5. On October 29, 2004, CS-2 was located and interviewed by law enforcement officials. CS-2 told law enforcement officials that in late August 2004, she was approached by RAMON BERRIOS, "Walter," "Joey," and an unknown Hispanic male nicknamed "Tone-tone". The four men asked CS-2 if they could utilize her vehicle in the early morning hours on August 23, 2004. According to CS-2, the group did not tell CS-2 why they needed her car, but she assumed they were going to use it to commit some illegal activity for money, because she had known them to commit illegal acts in the past. According to CS-2, "Walter" promised her that the group would pay her several hundred dollars for the use of her vehicle, and CS-2 agreed to let them use her car.

6. According to CS-2, on the morning of August 23, 2004, CS-2 drove her red Toyota to a residence in Aurora, Illinois, as Walter had instructed her to do. BERRIOS, "Walter," "Joey," and "Tone-tone" departed the area, with BERRIOS driving CS-2's car, and the others in another car. BERRIOS returned to the residence sometime between 7:45 and 8:00 a.m., where CS-2 was waiting, and returned CS-2's car to her. According to CS-2, CS-2 spoke with BERRIOS in person later that evening, at which point BERRIOS told CS-2 that he and the other three men had robbed an office in West

3

Chicago, Illinois, where an old man worked and had a lot of cash in a vault. According to CS-2, BERRIOS also said that JAVIER REYES, whom CS-2 knows, formerly worked at the office they had robbed and assisted the group in planning the robbery. CS-2 knows REYES to use the nickname "Javey." CS-2 told law enforcement officials that on that same evening, "Walter" gave CS-2 $600 in cash for the use of her car. According to CS-2, "Walter" told her that $200 were from Joey's share. CS-2 further stated that "Walter" was arrested that night by the Aurora Police Department for an outstanding warrant. CS-2 picked "Walter" up from jail that night and received another $100 in cash from "Walter" at that time. According to CS-2, in the several weeks following the robbery, REYES called CS-2 on a regular basis, sometimes several times a day, to find out if she knew where BERRIOS and "Walter" were, and also to find out what CS-2 knew about the robbery. According to CS-2, REYES told CS-2 not to say anything if she was ever questioned by the police about the robbery.

7. On October 29, 2004, CS-2 positively identified photographs of RAMON BERRIOS and JAVIER REYES.

8. On November 1, 2004, CS-2 was shown a photograph of WALTER DE JESUS, date of birth April 22, 1979. CS-2 positively identified DE JESUS as the individual she knew as "Walter." CS-2 was then shown a photograph of JOSE TORRES, date of birth December 14, 1977, and CS-2 positively identified the photograph as the individual she knew as "Joey."

9. On November 2, 2004, the victim employee at WECO Credit Union was shown a photo array containing six photographs, including a photograph of WALTER DE JESUS. The employee positively identified DE JESUS as the individual who had

first confronted the victim at WECO the morning of the robbery (Person 1). The employee was also shown a photo array containing six photographs, including a photograph of BERRIOS, but the employee was unable to positively identify BERRIOS. The employee also told law enforcement officials that JAVIER REYES had been employed by WECO as a loan officer from May 2004 through approximately August 17, 2004. The employee said that REYES had been hired through a temporary employment agency, but that the employment agency had removed REYES from his job at WECO due to allegations that he was involved in a sexual assault in the parking lot outside WECO.

10. On November 2, 2004, CS-1 participated in a consensually recorded in-person conversation with BERRIOS. During the conversation, CS-1 asked BERRIOS for details about the robbery, referring to the robbery as "when you, Walter and Joey bumped off the, off that dude," and "When you all robbed that place." In response to CS-1's questions, BERRIOS acknowledged the involvement of himself, "Walter," "Joey," and "Javey" in the robbery, and specifically acknowledged that they had to hit a man on the head because he wouldn't open "the safe." BERRIOS talked about the details of the robbery, including the need to have drivers and lookouts. He also stated that they "sat in there for 30 minutes' and "took our time tryin' to find everything." He said that the they had gotten "450" thousand for the job, and that the funds were split "four ways actually 'cause Javey didn't get shit." BERRIOS also noted that "Javey" had worked at the place that they robbed, and that Javey "decided to quit a week before it was supposed to happen."

11. Based on evidence described in this affidavit and my experience and training, I believe there is probable cause to believe that on or about August 23, 2004, RAMON BERRIOS, WALTER DE JESUS, JAVIER REYES, and JOSE TORRES did rob the WECO Credit Union in violation of 18 U.S.C. §§ 2113(a) and 2.

FURTHER AFFIANT SAYETH NOT.

_____
Eric R. Kaley
Special Agent
Federal Bureau of Investigation
West Resident Agency

Sworn to before me and subscribed in my presence this 4th day of November, 2004.

_____
United States Magistrate Judge

6